**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

............................................................X

ELENI TSERPELIS A/K/A ELENI LAGOS,

                              Plaintiff,

              - against -

BDO USA PC, MATTHEW BECKER, MATHEW
DEMONG, STEVEN WINTER, CATHERINE MOY,
and LUCY CORDON;

                            Defendants.

............................................................X

Case No.:

**<u>COMPLAINT</u>**

**JURY TRIAL DEMANDED**

       Plaintiff Eleni Tserpelis a/k/a Eleni Lagos, by her attorneys, Filippatos PLLC, hereby alleges against Defendants BDO USA PC ("BDO" or the "Company"), Matthew Becker, Mathew DeMong, Steven Winter, Catherine Moy, and Lucy Cordon (together, the "Individual Defendants") as follows:

<u>**NATURE OF THE CASE**</u>

***<u>B</u>rutes, <u>D</u>estroyers & <u>O</u>ppressors***

      1.      This is a case about the callous and calculated sabotage of Plaintiff's illustrious career by the ***<u>B</u>rutes, <u>D</u>estroyers, and <u>O</u>ppressors*** of BDO after Plaintiff's life was abruptly turned upside down by her son's devastating and incapacitating medical condition.

      2.      What ***<u>B</u>rutes, <u>D</u>estroyers, and <u>O</u>ppressors*** such as BDO do is ***<u>B</u>ully, <u>D</u>iscriminate, and <u>O</u>stracize*** their victims, as Defendants did to Plaintiff in this case.

      3.      In their commercials where BDO proclaims ***"People who know culture, respect, and collaboration, know BDO,[1]"*** the Company conveniently omits the brutal reality experienced

---

[1]   *See* BDO Thriving: Culture, Respect, Collaboration, YOUTUBE (Jan 3, 2024), https://www.youtube.com/watch?v=_59NWQnxP6M/.

by female employees who dare to prioritize caring for their children, or worse those who, like Plaintiff, had their lives upended by an extremely rare and no less debilitating disease of her child.

4.     Behind closed doors, BDO executives – likening Brigands, Dastards, and Oligarchs from the Gilded Age – systematically crushed the career of an exceptional and decorated tax "partner"—first slashing her annual compensation by approximately $100,000 while she sat helpless at her son's pediatric ICU bedside after his catastrophic brain hemorrhage, then cutting her monthly draw nearly in half without warning and setting impossible revenue targets for her, and ultimately firing her just months before she was due to receive millions of dollars from an employee stock ownership plan ("ESOP") transaction. Why did they do so? Because the people who are invisible to the old boys club of BDO are mothers such as Plaintiff, who would courageously sacrifice everything for the care of her gravely stricken child. For the heartless profiteers who own BDO, we allege, women, mothers, caretakers, and parents of disabled children have no value because BDO is run as ruthlessly as any inhumane institution that demands blind servitude, crushes individuality, and punishes dissent reminiscent of the Dark Ages.

5.     The evidence will establish that BDO's calculated destruction of Ms. Lagos's stellar career unfolded not because of performance issues, as they claimed.  In fact, Plaintiff had consistently exceeded her revenue targets for many years, had client tenures that exceeded 10 years, had a following with staff and was active in the marketplace.

6.     Accordingly, Plaintiff seeks an award in this case, including damages (pecuniary, compensatory, liquidated, and punitive) and attorneys' fees in excess of Seventy-Five Million Dollars ($75,000,000).

7.    Plaintiff's consistent success at BDO includes but is not limited to FY May 1, 2019, to April 30, 2020, when Plaintiff's core tax revenue goals were set at $1.10006 million, and she exceeded them by bringing in $1.269 million in core tax revenue.

8.    Despite working remotely during the global COVID-19 pandemic, Plaintiff still achieved remarkable results in FY May 1, 2020, to April 30, 2021. Her core tax revenue goal (which was set before the pandemic) was $1.69 million, and she successfully generated $1.524 million in core tax revenue. Additionally, she cross-sold into other tax lines, resulting in a total tax revenue of $1.99 million.

9.    Therefore, while she received a performance rating of "keep improving" for FY2021, due to the slight shortfall in core tax revenue during the pandemic, based on her significant cross-selling efforts, Plaintiff was awarded a bonus of $25,000 in recognition of this.

10.    In FY May 1, 2021, to April 30, 2022, Plaintiff's core tax revenue goal was $1.589 million, and she greatly exceeded this goal by bringing in $1.995 million in core tax revenue, and a total of $2.6 million for all total tax revenue.

11.    Just days after the close of FY2022, on May 7, 2022, Ms. Lagos received some of the worst news that any parent could imagine—her son, a varsity soccer star, had suffered a brain stem stroke while playing soccer, the very same day he took his SATs for the first time.

12.    He required immediate intubation and ventilation, had his skull drilled with an external drain, and was ultimately in the pediatric Intensive Care Unit of the hospital for 32 harrowing days.

13.    Plaintiff's son was diagnosed with a cerebral hemorrhage, resulting from an undiagnosed and extremely rare cerebral vascular disease known as an arteriovenous malformation (AVM).

14.     In an instant, Ms. Lagos not only became a primary caregiver to her severely disabled son, but she was also immediately required to begin making life-or-death decisions to ensure her son received the appropriate diagnosis and medical care and to avoid complications. To say her life was turned upside-down is an understatement.



*Ms. Lagos and her son prior to his stroke and Ms. Lagos's son following his stroke.*

15.     As Plaintiff was sitting at her son's bedside in the hospital's Intensive Care Unit, while he was intubated and unresponsive with such a severe buildup of fluid in his brain that he required immediate drainage directly from his skull to relieve the life-threatening pressure, Defendants not only failed to answer Plaintiff's calls but they began a calculated and callous effort to end her career at BDO.

16.     Rather than honoring their obligations under the law to support Ms. Lagos during this tragic time for her family, BDO did the opposite.  As will be explained further herein, BDO retaliated against Ms. Lagos through a cruel and abusive campaign in which they unilaterally reduced her partnership units while she was on leave (cutting her anticipated annual compensation by approximately $100,000, slashed her monthly draw from $33,000 to $13,000 without notice,

stripped her of leadership roles that directly impacted her ability to develop client relationships and generate revenue, set an impossibly high revenue target for the Fiscal Year ("FY") after she returned from leave, a target which was nearly double any other partner's, and ultimately, to the shock and dismay of both Ms. Lagos and many of her colleagues, terminated her employment without either warning or cause.

17.    What had previously raised concerns for Plaintiff regarding BDO's unforgiving and unreasonable culture, including but not limited to BDO honoring a partner for **not** taking a leave of absence when diagnosed with non-Hodgkins Lymphoma, was now patently clear to Plaintiff. While the law may require BDO to offer family and medical leave, BDO expects quite the opposite. Upon information and belief, a number of senior executives at BDO took leaves of absence for many weeks, if not months, to deal with third party family medical emergencies.

18.    Despite the fact that Plaintiff had significantly exceeded both her core tax revenue goal and any total tax revenue expectation in FY2022, once she returned from only four (4) months of FMLA leave, Plaintiff was met with discrimination, isolation, aggression, harassment, pretextual performance criticisms, and denial of necessary resources.

19.    Ultimately, in March 2023, BDO terminated Plaintiff's employment under the false pretext of "significant performance issues," which BDO not only failed to justify or explain but which BDO explicitly connected to Plaintiff's leave and her association with her disabled son, including Defendant Winter stating to Ms. Lagos, "[w]e're not giving you a pass just because you were on leave" and that "you're going to have to make it all up in one year."

20.    After terminating Plaintiff's employment, BDO further violated federal law by failing to provide proper COBRA notices and interfering with the continuation of Plaintiff's healthcare coverage, which was particularly devastating for Ms. Lagos, who was responsible for

providing health insurance coverage for her severely disabled son who required ongoing extensive medical care and treatment.

21.     As a result, without income and without health insurance, Ms. Lagos and her family had the additional unthinkable burden of figuring out how to cover the costs of the medical treatment her son desperately required.

22.     Not only was the termination of Plaintiff's employment unthinkable, but its timing was particularly suspect, occurring just months before a major $1.3 billion employee stock ownership plan ("ESOP") transaction, from which Plaintiff would have received millions of dollars as a full equity partner. Notably, two other female BDO partners were similarly ousted before this lucrative transaction.

23.     Accordingly, Plaintiff brings this action asserting claims against Defendants for breach of contract, retaliation, and discrimination (gender/sex, associational disability, and caregiver status) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"); the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), the New York State Human Rights Law, New York State Executive Law, §§ 296, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107, *et. seq.* ("NYCHRL").

**PARTIES, JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES**

24.    At all times relevant hereto, Plaintiff was a resident of the State of New York, County of Queens.

25.    At all times relevant hereto, under the relevant statutes and for purposes of liability, Plaintiff constituted an employee of BDO USA, PC.[2]

26.    Additionally, the terms, conditions, and practices concerning Ms. Lagos's employment relationship with BDO demonstrates that Ms. Lagos functioned as an employee, despite having the title of partner, because: (1) BDO terminated Plaintiff without following the "for cause" requirements in the partnership agreement, demonstrating their control over her employment; (2) Plaintiff was supervised by Defendant Winter and Defendant DeMong, who monitored her performance and controlled her work, including her staffing decisions; (3) Defendant Winter and Defendant DeMong exercised the ability to control Ms. Lagos's access to clients and resources; (4) Plaintiff had minimal influence over the organization as evidenced by BDO unilaterally transferring her clients to other partners; (5) BDO unilaterally stripped Plaintiff of leadership roles; (6) BDO unilaterally prorated Ms. Lagos's compensation based on hours worked rather than revenue generated; and (7) while Plaintiff shared in profits through her units, BDO unilaterally reduced those units while she was on leave caring for her disabled son, treating her compensation more like an employee's salary than a partner's equity stake. Finally, BDO's

---

[2] During her employment, Ms. Lagos was employed by BDO, LLP. However, BDO LLP converted to BDO, PC in 2023. BDO USA, PC is liable for Ms. Lagos's claims against its predecessor organization BDO USA, LLP as BDO USA, PC is merely a continuation of the business operations of BDO USA, LLP and has assumed liability for claims of BDO USA, LLP. In continuing the operations of BDO USA, LLP, BDO USA, PC maintained the same principal place of business, similar assets and liabilities, and continuity of executive leadership, including the same Chief Executive Officer (Wayne Berson) and Chief People Officer (Catherine Moy). Since 2014, Mr. Berson has also been the Chair of the Global Board of Directors of BDO International, Ltd., BDO USA, LLP's and BDO USA, PC's parent company. As such, Mr. Berson maintained control over BDO, USA LLP and continues to maintain control over BDO, USA PC. Additionally, should Ms. Lagos have remained employed by BDO after its conversion to a corporation, she would have reported to the same executives that remain at BDO to date, Matthew DeMong and Matt Becker. In converting to BDO USA, PC, BDO USA, LLP has effectively ceased all business operations.

recent conversion to a corporation reflects that its operating structure and practices that Plaintiff worked under aligned with the status of an employee rather than partner.

27.    At all times relevant hereto, BDO was and is a domestic for-profit organization maintaining a principal place of business at 330 N Wabash Ave Ste 3200, Chicago, IL, 60611 - 7610, USA.

28.    Upon information and belief, BDO USA employs over 5,000 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes under which Plaintiff is proceeding herein.

29.    Upon information and belief, at all times relevant hereto, Defendant Matthew Becker was and is an individual residing in the State of Michigan, as well as an employee of BDO, holding the position of " National Managing Principal of Tax at BDO USA," and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.  Upon information and belief, Defendant Becker has also been identified as the likely successor to the CEO of BDO USA after the current CEO Wayne Berson's retirement in 2026.

30.    Upon information and belief, at all times relevant hereto, Defendant Mathew DeMong was and is an individual residing in the State of Massachusetts, as well as an employee of BDO, holding the position of "Tax Managing Principal," and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

31.    Upon information and belief, at all times relevant hereto, Defendant Steven Winter was and is an individual residing in the State of New York, as well as an employee of BDO, holding the position of "Tax Market Managing Principal and Northeast Financial Services Tax Practice

Leader" and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

32.    Upon information and belief, at all times relevant hereto, Defendant Catherine Moy was and is an individual residing in the State of Massachusetts, as well as an employee of BDO, holding the position of "Chief People Officer" and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

33.    Upon information and belief, at all times relevant hereto, Defendant Lucy Cordon was and is an individual residing in the State of Illinois, as well as an employee of BDO, holding the position of "People & Culture, Director of Benefits" and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

34.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331. This Court has supplemental jurisdiction over the claims that Plaintiff has brought under state and city laws pursuant to 28 U.S.C. §1367.

35.    Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as one or more Defendants reside within the Southern District of New York, and a substantial part of the acts complained of herein occurred therein.

36.    Prior to the filing of this complaint, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on June 16, 2025. Plaintiff will seek leave to amend her Complaint to include claims under Title VII and ADA upon receipt of a Notice of Right to Sue.

37.    All of Plaintiff's claims are timely as parties have entered two tolling agreements, which toll the relevant statutes of limitations from January 18, 2024, until either party notifies the other that they wish to no longer be bound by the current tolling agreement.  Defendants notified Plaintiff that they no longer wish to be bound by said agreement on June 11, 2025.

## FACTUAL ALLEGATIONS

**A.    Plaintiff Joins BDO and Excels in Her Role**

38.    Prior to joining BDO, Plaintiff accumulated over 20years of experience in Public Accounting, including working for three "Big 4" accounting firms starting as early as her junior year of college as an intern: Deloitte, Ernst and Young, and PricewaterhouseCoopers.

39.    Prior to joining BDO, Plaintiff worked at EisnerAmper, where she was quickly promoted to Partner.

40.    Due to Plaintiff's impressive experience and success, BDO's East Region Assurance Managing Principal, Demetrios Frangiskatos, actively sought out Plaintiff beginning in 2017 to join BDO with the hopes that Plaintiff would grow a non-audit tax outsourcing and co-sourcing practice for the New York Metropolitan market (an ASC740 practice) (Channel 2).

41.    Plaintiff was initially offered a partnership position by then Northeast Tax Regional Leader, Randy Schwartzman, which she declined. Randy Schwartzman, a highly respected and technical tax guru who became a National Transactions Leader, regarded Plaintiff so highly that he suggested that she become the Tax Office Managing Partner for Stamford, Connecticut, with Ms. Maria Karalis, a Board member, as her counterpart to lead the office.

42.    In an effort to incentivize Plaintiff to join BDO, BDO offered Plaintiff a position as an equity partner (i.e., variable share partner or VSP), which she accepted.[3]

---

[3] The rare nature of being hired as an equity partner further highlights Plaintiff's significant experience and exceptional qualifications.

43.    In April 2019, Plaintiff formally joined BDO as a corporate tax partner with a specialty in ASC740 tax, bringing with her two client accounts, which at the time of her termination continued to create significant revenue for BDO.[4] In her role, Plaintiff was given responsibility for the strategic implementation of various key projects for BDO, including overseeing the outsource or co-source tax department for mixed-sized companies and building capabilities of the BDO's tax department.

# NY Metro ASC 740 Market



44.    Plaintiff was also tasked with creating a bridge between the audit and tax partners, a project that many others had attempted but Plaintiff was the first to accomplish, leading to her direct relationships with Assurance Marketing Managing Principal, Maria Karalis, East Region Assurance Managing Principal, Demetrios Frangiskatos and National Managing Partner of Industry Groups, Natalie Kotlyar, who were in the NY Metro market.  Plaintiff was instrumental

---

[4] Throughout Plaintiff's employment at BDO, the two client accounts she initially brought to BDO were consistently within BDO's NY metro office's 5 largest ASC740 tax clients.

in generating meetings with potential new clients but also expanding services to existing clients, resulting in more revenue opportunities for all of BDO—not just her department.

45.    As part of her compensation, Plaintiff was provided a share of the partnership's profits through unit earnings. Plaintiff received 800 full-equity units (valued at approximately $1,000 per unit in September 2022).

46.    Plaintiff's membership in the partnership was governed by a partnership agreement that laid out the terms and conditions of her membership, including that the Board of Directors may terminate the interest in the partnership of a partner only "for cause."[5] Plaintiff received partnership distributions based upon her 800 units, which amounted to approximately $800,000 per year until in or around September 2022.

47.    It was widely known that Plaintiff set the gold standard during her initial three years at BDO. Demonstrating BDO's recognition of Plaintiff's exceptional performance, in October 2019, Plaintiff was appointed by Defendant DeMong to be the Sub-OMP (Office Managing Partner) in BDO's NYC office for the corporate tax practice (CTS).

48.    However, in early 2020, when Plaintiff began receiving less support in the practice than initially promised to properly service her clients, she needed to step back from the OMP role. Prior to stepping back, Plaintiff discussed her concerns with Defendant DeMong. Defendant DeMong directed Ms. Lagos to focus on pleasing her transferred clients, and while the OMP role primarily focused on employee assignments, Plaintiff expected that staffing for her clients would not be a significant issue as she expected to have authority to make her own staffing decisions.

49.    To this end, and based on the lack of training offered to the NYC office staff, none of which had ASC740 training when Plaintiff joined, Plaintiff discussed with Defendant DeMong

---

[5] As discussed below, BDO violated the partnership agreement by terminating Plaintiff' partnership without cause.

that if she charged all the time she was spending training her staff, she would push the client metrics into losses.

50.    However, Defendant DeMong assured Plaintiff that he was not concerned with the number of hours Plaintiff charges to the client and will not use that as a metric to assess her contribution to the practice.

51.    In late Spring of 2020, Plaintiff was appointed to the newly created role of National Life Sciences Tax Leader.

52.    Multiple supervisors across different groups, including Kate Lottridge (National Marketing Director) and Nadia Leather (Marketing Leader), indicated to Plaintiff that she did an excellent job during her tenure, putting "life" back into the life sciences industry group.

53.    For instance, throughout 2020, Managing Partner, Rich Bayer, repeatedly told Plaintiff that she "gets it on all levels." Mr. Becker texted Plaintiff, "You work hard and deliver." Esayas Messele, a Principal, Tax Practice Leader, stated to Plaintiff, "You know, Eleni, when I grow up, I want to be a partner like you," and compared her to Paul Heiselmann, a former superstar partner at BDO. Plaintiff was told by Eskander Yavar, National Managing Advisory Partner and member of the executive leadership team, "We need more partners like you." Defendant DeMong told Plaintiff, "You are doing all the right things. Rich and I were saying the other day that we wish all were doing what you are doing."

54.    Plaintiff was well-liked by her staff and clients, with key hires at the most senior levels coming over to BDO to work with Plaintiff and staff members often requesting to be on her teams.

55.    In 2021, in addition to all her roles, Plaintiff was asked to lead an Office of the Chairman account with a dedicated marketing team leader (Mary-Heather Tatum), a position given

to only 25 partners across the country and overseen directly by the CEO Wayne Berson. Plaintiff was given this role due to her deep relationships at the C-Suite level with a public company with potential for significant cross revenue generation. Plaintiff led a team of approximately 12 senior executives, including partners and specialists across the country working for different subsidiaries and segments of the business.

56.     As part of this work, Plaintiff successfully met one of the goals of the office of the Chairman account program by earning the opportunity to propose a seven-figure global tax project coordinated across multiple countries. While this client ultimately decided to renew this project with its incumbent Big 4 firm, the opportunity Plaintiff coordinated was significantly praised by Defendant DeMong and BDO leadership. In fact, one of the most respected business development leaders, David Lauhoff, said Plaintiff could run circles around many of the Big 4 partners.

57.     Based on this exceptional work, Plaintiff received positive performance reviews in both 2020 and 2021, where, among other things, her revenue-generating abilities were highlighted.

58.     Plaintiff's 2020 review stated, in part, "In the last quarter alone [Plaintiff] has generated a fee of $130,000." Plaintiff's 2021 review stated, in part, "significant cross-selling was done by Eleni among all service lines to Life Science prospects and clients."

**B.  Plaintiff's Male Peers Receive Preferential Treatment**

59.     Unfortunately, to Plaintiff's dismay, she quickly realized that BDO was a "boy's club," where women were treated disparately, particularly mothers and female employees in caregiver roles. For instance, when Plaintiff indicated to Defendant DeMong that Managing Director, Anne Benvenuto, a woman with children, was a good candidate for partner, Defendant DeMong unjustifiably dismissed the idea despite Ms. Benvenuto's excellent performance.

14

60.     Against this backdrop, it is unsurprising that allegedly none of the women on BDO's Board of Directors have young children. Moreover, it is unsurprising to see that only men serve on the Board of Directors of BDO Global:



61.     To that end, Plaintiff was not treated equally in her leadership role as the National Life Sciences Tax Leader. Unlike her similarly situated male colleagues, Lance Minor and Todd Berry, Plaintiff did not receive the National Life Sciences Tax Co-Leader title and was omitted from the company's industry landing page on their website.

62.     Despite contributing and participating equally, at times representing leadership on internal market strategy calls as the sole attendee, Plaintiff was denied exposure to BDO's board and was not considered "official."

15

63.     Despite multiple requests to change her title, including advocacy by several female colleagues who attributed to Plaintiff the fact that there was "life breathed into the industry group," Plaintiff's requests were never granted. Instead, Plaintiff was told to "get over it" and "let it go."

64.     Defendant DeMong often complained that Plaintiff was one of the highest-paid tax partners in the Northeast, even though she did not receive a raise for performing additional roles, including National Life Sciences Tax Leader.

65.     In February 2022, Plaintiff was one of several employees who interviewed Bijal Mehta, to join the ASC740 group as a Director. Despite Plaintiff objecting to hiring Ms. Mehta at that level based on her lack of relevant experience, Plaintiff's male colleague hired her and forced Plaintiff to use her as a resource even on the most challenging new accounts that required a strong day-to-day manager.

66.     In or about February 2022, when a fellow partner, Brian Rose, left BDO, Plaintiff did not receive any of his revenue-generating accounts. Instead, these lucrative accounts were given to her male colleagues, including a direct admit non-equity partner, Michael Hong. When Plaintiff raised her concerns regarding this disparate treatment, Defendant DeMong stated that Mr. Hong "needed revenue."

67.     Not only does this situation highlight the disparate treatment Plaintiff faced at BDO, but also that BDO retained control over Plaintiff's accounts and Plaintiff's hiring/staffing decisions, making it increasingly clear that she was an employee.

68.     In addition to the above disparate treatment, multiple supervisors used heavily gendered language toward Plaintiff. By way of example, Defendant DeMong claimed that Plaintiff must be pleased about COVID-19 shutdowns since she could "be home with the kids."

69.    Furthermore, Managing Office Tax Principal, Matt Dyment, texted Plaintiff to tell her that she should raise a matter "nicely," implying that Plaintiff should not act in a manner that was consistent with her forward and often aggressive male peers.

70.    In a similar vein, Plaintiff was also chastised by a tenured male Senior Manager that he did not like her "tone." Finally, Plaintiff was excluded in a manner that her male colleagues were not, including not being invited to social gatherings, conferences, and meetings, as explained further herein.

**C.    Plaintiff's Son Suffers a Disabling Brain Stroke and Plaintiff Is Subjected to Discrimination and Retaliation**

71.    On May 7, 2022, right after Plaintiff had closed out her most successful fiscal year at BDO, Plaintiff's son, Chris, a varsity soccer player, suffered a devastating brain stem stroke on the soccer field, which led him to be hospitalized, incapacitated, and unable to take care of himself.

72.    Plaintiff's son was immediately intubated, had severe hydrocephalus that required direct drainage from his skull, and was ventilated for approximately ten (10) days. His complex care and multiple brain surgeries required an ICU stay which extended over a month. Eventually, his doctors diagnosed him with a cerebral hemorrhage resulting from an undiagnosed rare vascular disorder called a brain arteriovenous malformation (AVM).

73.    In an instant, Plaintiff became not only a primary caregiver but also a medical coordinator to her disabled son, an especially difficult task given the rare disease diagnosis and dangerous location of the vascular anomaly, which was in his brainstem.

74.    Plaintiff's son's condition has been, and continues to be, severe and life-threatening. Very soon after he was admitted to the hospital, he needed to be transported to a different hospital with the right capabilities, he was unresponsive and intubated, still muddied from the soccer field with pieces of artificial turf stuck to his skin.

75.    The doctors were somber. The brainstem location of his AVM hemorrhage carried extraordinary consequences including the horrifying possibility of "locked in syndrome," a condition the doctors warned would mean he had full intellect but no ability to communicate with the outside world.

76.    Plaintiff's son also suffered from severe hydrocephalus, which is a buildup of fluid in the brain, requiring immediate surgical intervention. Chris underwent five separate brain surgeries. The first procedure had to be performed at his bedside to relieve the pressure from fluid buildup in his brain. It was a life-saving measure so urgent that there was no time to transport him to the operating room.

77.    After more than a month in the Pediatric ICU at Columbia Presbyterian Hospital, on June 6, 2022, Chris was released to an inpatient children's rehabilitation hospital an hour from Plaintiff's home.  He was wheelchair-bound, visually impaired and unable to speak, and experienced frequent aspiration, which greatly increased his risk of recurrent pneumonia.

78.    At the same time, Plaintiff's second child was graduating middle school but Plaintiff was unable to attend all events or activities given Chris's severe condition that required Plaintiff's full attention and medical management. Plaintiff also has a third child who was only 5 years old at that time.

79.    On the same day her son was first hospitalized, Plaintiff immediately called Defendant DeMong. She drew upon the relationship they had developed over years of constant communication and support. She recalled his advice from the early days of the COVID-19 pandemic in March 2020 when he had said, "Make sure you take care of yourself and your family; don't worry about work. Your team can cover for you."

80.    With her son by her side, she reached out to Defendant DeMong for help. Notably, prior to her son's catastrophic injury, BDO had been accommodating to the plaintiff, allowing her to work from home and maintain flexible arrangements. However, this supportive attitude drastically changed once her son became incapacitated and required her care as a primary caregiver.

81.    In addition to Defendant DeMong, Plaintiff also informed Defendant Winter and Mr. Frangiskatos that she needed to take a protected leave of absence to care for her son. Defendant DeMong and Defendant Winter did not answer Plaintiff's calls. However, Mr. Frangiskatos told Plaintiff, "Don't worry about a thing; we will take care of everything."

82.    On May 7, 2022, Plaintiff desperately informed Defendant DeMong that her son "has bleeding on the brain," was "on a breathing machine," and being "transferred to ICU," even stating "I'm dying Mat" in her anguish.

83.    Despite the gravity of this life-threatening emergency, Defendant DeMong—who had previously shown genuine concern and flexibility for Plaintiff during the COVID-19 pandemic—did not respond to Plaintiff's phone call until the following day with perfunctory expressions of sympathy.



84.    Plaintiff, despite the unthinkable circumstances she was in, followed up by emailing all her clients, letting them know she needed to take a leave due to her son's condition and copied leadership, informing her clients they are in their "good hands."

85.    However, despite Plaintiff's best efforts to ensure seamless coverage during her leave, Mr. Frangiskatos' assurances of support were not only empty promises but her son's horrifying medical condition was the beginning of the end of Plaintiff's career at BDO.

86.    Within two weeks, while Plaintiff was in the thick of managing her son's medical issues, Defendant Cordon contacted Plaintiff repeatedly requesting that she complete a Partner's Personal Leave Absence Request form that indicated Plaintiff's specific return-to-work date.

87.    Notably, at that time Plaintiff's son was still in the Pediatric ICU and Plaintiff had no way of knowing when he would be discharged or what would happen next.

88.    In contrast, upon information and belief, male partners (including Managing Principal, Robert Trinchetto) informally received leave without involvement by Defendant Cordon or any other HR employee.

20

89.     Plaintiff was surprised by the number of times Defendant Cordon attempted to contact her despite being aware that Plaintiff could not respond. At a certain point, Defendant DeMong even texted Plaintiff, asking that she respond to Defendant Cordon.

90.     Despite the impossible circumstances of living in her son's ICU room, Plaintiff complied with the request and provisionally indicated that she would be on leave until the third week of September. Plaintiff told Defendant Cordon that her estimated return date was uncertain at that time but that, if all went well for her son, Plaintiff's earliest return would be the end of September.

91.     Defendant Cordon seemed to assure Plaintiff that HR would reach out to her in advance of her return date to see if there were any changes to the plan.

### D.  **BDO Loses One of Plaintiff's Largest Clients While Plaintiff Is on FMLA Leave**

92.     While Plaintiff was on leave, Ms. Mehta, who did not have significant experience, became the default lead over a significant client account that Plaintiff managed, an account that had grown so quickly and significantly that Plaintiff had been spotlighted on the internal BDO website as a "success story" for revenue generation through cross-selling.

93.     While this client had just submitted a Request for Engagement to Plaintiff in May 2022, in June 2022, when Plaintiff was still on leave, BDO alleges to have lost this client after Defendant Winter failed to properly replace Plaintiff on the account, resulting in the client deciding to move their work to PricewaterhouseCoopers.

94.     Plaintiff later learned that Defendant Winter, having not first established a relationship with this client, presented them with an invoice for time and expense that BDO had incurred, which was unreasonably high due to Ms. Mehta's inexperience in managing large engagements and client economics.

95.    This led to a heated exchange between Defendant Winter and the client where the client threatened to sue BDO.

96.    The loss of this client resulted in dire consequences for Plaintiff, who had been forbidden by BDO from having any contact with this client despite the fact that they were reaching out to ask how her son was doing.

97.    Plaintiff repeatedly requested permission to respond to this client while she was on leave, but her requests were denied.

**E.    Defendant DeMong and Defendant Winter Make Discriminatory Changes to the Terms and Conditions of Plaintiff's Employment, Including Her Compensation**

98.    Despite Plaintiff's excellent performance in FY2022, which ended on April 30, 2022 just days before her son's stroke, BDO did not provide Plaintiff a performance review or a bonus even though Matt Becker had assured her in Fall 2021 that both would occur.

99.    During this Fall 2021 meeting, Plaintiff had shared with Defendant Becker that she expected to be issued more units based on her exemplary performance, including the fact that she had just landed a significant new account and was working directly with Defendant Becker for the Goldman Sachs opportunity that came in through her relationship and was ultimately awarded to BDO.

100.    In response, Defendant Becker searched Plaintiff's name in his database on his laptop and acknowledged that Plaintiff was "under" where she should be and that based on her results to that date, Plaintiff should expect a unit increase at the end of the fiscal year, which was April 2022.

101.    However, in August 2022, while Plaintiff was on leave caring for her son, she learned that instead of any increase, the Board of Directors cut Plaintiff's units by 100.  This was shocking to Plaintiff because the fiscal year that had just closed was her best. The only change in

her circumstances since being told she was entitled to an increase in units was her son's stroke and her subsequent FMLA leave.

102.    As soon as Plaintiff saw the significant pay cut, she alerted Defendant DeMong who dismissively and vaguely responded, "We can discuss when you are back in a few weeks. There are a couple of things that go into it."

103.    Plaintiff then confided in several fellow female partners about the discrimination she was experiencing. One female partner advised Plaintiff against complaining and repeatedly told her to "let it go" due to BDO's history of retaliatory conduct. Another female partner told Plaintiff that she was disgusted by BDO's treatment of Plaintiff but was "not surprised."

104.    By September 2022, BDO's HR Department had not yet called Plaintiff to check-in, as promised. Instead, on the morning of September 19, 2022, Plaintiff suddenly received an email from Mr. Bayer, which in essence pretended that her family's tragedy had never happened, and simply welcomed her back to work. Shortly after Mr. Bayer's email, BDO requested that Plaintiff confirm that this was, in fact, her return-to-work date.

105.    Plaintiff, feeling pressured to return to work with lack of acknowledgment by leadership about the severity of the medical event and the surprise loss of her units but also still unsure about her son's condition and continuing medical needs, indicated to Defendant Cordon that she would have to return at a limited capacity, i.e., intermittent leave.

106.    On September 23, 2022, Plaintiff had a video conference with Defendant DeMong and Defendant Winter to reconnect and to discuss the reduction of her units, which had been implemented during her leave.

107.    During this meeting, Plaintiff shared extensive details regarding her son's condition, telling Defendant DeMong and Defendant Winter that her son was still recovering and that doctors still needed to address what they called a "ticking time bomb" in his head.

108.    Plaintiff shared that just weeks later, on October 4, 2022, after consultations with multiple neurosurgical hospitals across the country, her son would be undergoing gamma knife radiation surgery to treat the abnormal blood vessels, which doctors hoped, but could not guarantee, would treat the AVM eventually, over a period of one to three years.[6]

109.    She explained that the "high value real estate" of the abnormal blood vessel within Chris's brain required treatment to be conducted slowly to avoid damage to healthy remaining brain tissue. No one could operate in this area to remove the AVM altogether given the high risk of morbidity.

110.    As such, Plaintiff told Defendant DeMong and Defendant Winter that she needed to be fully available for her son when that procedure occurred and during his recovery therefrom. However, Plaintiff made clear that she was willing to work part-time because she was the sole breadwinner of her household. Plaintiff emphasized that she was not on a sabbatical but rather undergoing a devastating life event, which BDO was required to accommodate.

111.    With zero empathy, Defendant DeMong and Defendant Winter ignored these personal details and simply pressured Plaintiff to determine when she would be working at "100%." Amping up the pressure, Defendant DeMong and Defendant Winter told Plaintiff that the measurement for "100%" is not 40 hours, but 50 to 80 hours, per week.

---

[6] Unfortunately, however, this gamma knife radiation procedure was ultimately unsuccessful as Chris experienced another stroke in January 2025, which was devastating.

112.     Plaintiff was so overwhelmed at their complete change in demeanor towards her that she felt compelled to say "guys this is me. Do you really feel you have to tell me that? I'm a partner because I always got the job done, regardless of the hours."

113.     Plaintiff then submitted an updated leave of absence request form, indicating that she would be working reduced hours from September 2022 until the end of the year. Shockingly, Plaintiff later learned that Defendant DeMong significantly reduced her monthly draw based on his arbitrary estimation of "full time" despite never disclosing to Plaintiff that her leave of absence would affect her compensation.

114.     The egregiousness of this reduction in Plaintiff's pay is further evidenced by the fact that, as a partner, Plaintiff's hourly contribution was not linear to the value of her accounts because the revenue from her clients was generated by the staff preparing the deliverables and not dependent on how many hours she worked.

115.     Additionally, partners were constantly discouraged from "overworking" because it led to poor employee morale, especially following an intense workload from the COVID-19 pandemic when the firm over produced.

116.     After the pandemic, BDO had launched a campaign to encourage partners to focus on increasing revenue and sales efforts as well as profitability measures, likely in preparation for entering into the ESOP transaction. They emphasized that at least 50% of each partner's time should be dedicated to business development, which is categorized as a "non-chargeable" activity. Defendant DeMong even threatened to "lock out" partners from the tax preparation software if they didn't delegate it to their staff and instead were doing the work themselves.

117.     Finally, while Plaintiff presented a very reasonable ramp-up plan where she would increase her weekly hours in 5-10 hour increments until reaching her full-time status in approximately

12 weeks, and emphasized that she would exceed these benchmarks as circumstances allowed, despite the fact that the number of hours she worked did not correlate directly to the amount of revenue she generated, Defendants DeMong and Winter seemed to ignore all of this.

118.    When their discussion turned to Plaintiff's unit reduction, Defendants DeMong and Winter stated that Plaintiff's units were cut because BDO lost one of her clients while she was on leave.

119.    In a clear act of scapegoating, they blamed the loss of this client on Plaintiff despite the fact that she was on full-time FMLA leave when the client relationship deteriorated. Ironically, email correspondence from this very client requested a new proposal for services one week after Plaintiff son's medical event which was two weeks into the new fiscal year. Upon receiving the news, the client expressed sympathy and support for Plaintiff  demonstrating that the client relationship remained positive toward Plaintiff personally, even as BDO's internal mismanagement caused the business relationship to sour.



120.    The loss of this client was therefore entirely attributable to the conduct of Defendant Winter and Ms. Mehta, not Plaintiff.

121.     Plaintiff emphasized that her performance evaluation period concluded on April 30, 2022—one week before her son's catastrophic stroke—and that the client loss occurred well after that. Furthermore, the supportive tone of the client's own communications and being forbidden to communicate with anyone at the client further exposes the pretextual nature of BDO's decision to scapegoat Plaintiff for a client loss that occurred during her protected leave and was caused by others' conduct.

122.     Defendant Winter directed Plaintiff not to engage with the client at all. Even though Plaintiff had officially returned to work, she was not asked to review the time sheets for the final billing presentations to the client and instead Director Anne Benvenuto, who had not worked on the account for months, was tasked with preparing the invoices.

123.     In that first phone call in late September 2022, Defendant DeMong also informed Plaintiff that he was stripping her of all roles, including removing Plaintiff from being the Metro NYC ASC 740 leader and National Life Sciences Tax Leader, both of which impacted Plaintiff's ability to generate revenue. For the Metro NYC ASC 740 position, Plaintiff was replaced by a male colleague.

124.     Prior to her son's stroke, Plaintiff was always an active participant and contributor at the Northeast National Life Sciences calls. And despite being notoriously combative towards others, Ms. Karalis, Assurance Marketing Managing Principal, had previously been professional, respectful, and courteous towards Plaintiff.

125.     However, on Plaintiff' first Northeast National Life Sciences call back from leave in October 2022, Ms. Karalis, was extremely demeaning towards Plaintiff. Likewise, none of the participants asked Plaintiff how she or her son were doing, nor did they welcome her back or sympathize with her situation. This left Plaintiff feeling ostracized and the mistreatment was so severe that soon after the call ended, another participant telephoned Plaintiff to ask if she was okay and stated

that it was "not right how they are treating you … this is a devasting situation." This colleague told Plaintiff, "They've done this to another employee, a Senior Manager, who had cancer. They fired him." Ultimately, Plaintiff was encouraged to speak with the Chief People Officer, Catherine Moy.

126.    The discriminatory nature of BDO's treatment of Plaintiff is further evidenced by correspondence on October 5, 2022, just a day after her son's surgery and gamma knife radiation treatment, in which Defendant Cordon subjected Plaintiff to unprecedented scrutiny regarding her timesheet entries during her protected leave period. This micromanagement of Plaintiff's time reporting stood in stark contrast to the informal and accommodating treatment afforded to her male colleagues, and demonstrated BDO's systematic effort to create additional administrative burdens and obstacles for Plaintiff while she was caring for her disabled son.

> Hi Lucy
>
> I've been spending my time connecting with the practice, my clients, my teams, the market. It's not billable time in my opinion. How does the firm want me to reflect the process of reconnecting and coming back into the fold?
>
> Eleni Lagos
>
> BDO, Tax Partner
>
> 718-810-2234
>
> _____
>
> **From:** Lucy Cordon <lcordon@bdo.com>
> **Sent:** Wednesday, October 5, 2022 3:03:09 PM
> **To:** Eleni Lagos <elagos@bdo.com>
> **Subject:** RE: BDO Partner Personal LOA FORM - one page.pdf
>
> Hi Eleni,
>
> Hope you are well. I was looking at your time sheets and noticed you have been entering "Excused" time each for the full day, just note you are on partial LOA as of 9/19/22 per the below, so the hours you work each week would need to be entered in time entry.
>
> Please let me know if you have any questions.

127.    On October 11, 2022, Plaintiff called Defendant DeMong to follow up on their September 23, 2022, conversation. Plaintiff expressed interest in returning to a more prominent role at BDO, including participating in public speaking engagements and events. In response, Defendant DeMong repeatedly attempted to convince Plaintiff not to do so, claiming that this would lead to fewer revenue opportunities for her.

128.     On that same day, Plaintiff communicated with Defendant Winter to ask why she was the only employee omitted from his listing of ASC740 partners on the last corporate tax call that he hosted mentioning only "Esayas, Mike (Cesarino) and Michael (Hong)," to which he quipped at the end "a lot of Michaels". His response was to claim it was "unintentional" and that he excluded himself as well, a frivolous attempt to cover up this intentional campaign of disassociation and exclusion of Plaintiff.

129.     Furthermore, Plaintiff raised with Defendant Winter the fact that NYC lifted the COVID-19 vaccine policy, which prevented her from coming to the office and yet BDO failed to provide a dial-in number for group meetings in the office to further advance their disassociation of Plaintiff.

130.     On October 24, 2022, Plaintiff emailed Defendant DeMong to ask if he wanted to resume their recurring check-in meetings that regularly occurred before her leave. However, Defendant DeMong never re-established the meetings.



131.     At or around the same time, Plaintiff discovered that BDO, without warning, reduced her monthly draw from approximately $33,000 to $13,000, which left her and her family in a sudden precarious financial situation.

132.    On October 27, 2022, Plaintiff reached out to Defendant DeMong after learning about her reduced monthly draw through her own discovery. He dismissively responded that she should reach out to Defendant Cordon. When Plaintiff asked Defendant Cordon, she indicated that Defendant DeMong should have communicated the salary reduction to Plaintiff.



133.    In short, both parties blamed each other and neither addressed Plaintiff's concern. That same day, Defendant Cordon indicated to Plaintiff that her salary was prorated and her monthly draw reduced *due to her intermittent FMLA-protected leave*.

134.    Plaintiff was shocked that her units had been cut, her salary prorated, and her monthly draw reduced—all because she needed to care for her disabled son.

135.    Plaintiff immediately followed up with Defendant DeMong, complaining that her benefits and pay were affected, unbeknownst to her, and she was "disheartened to go through this during such a personal tragedy." Defendant DeMong once again failed to respond.

**F.    Plaintiff Complains About Discrimination to BDO's HR and Other Senior Colleagues**

136.    On October 27, 2022, the same day that Plaintiff spoke with Defendant DeMong and Defendant Cordon about her reduced draw, Plaintiff complained to Defendant Moy about the

discriminatory treatment she was being subjected to in response to her need to take leave to care for her disabled son. In particular, Plaintiff spoke about her salary being prorated and her monthly draw being cut in half without notice.

137.    In response, Defendant Moy went on a tangent that made clear that she would be perpetuating BDO's culture of failing to support working mothers and caregivers of medically disabled children.

138.    In fact, Moy prefaced her speech by stating, "I can't even begin to imagine what you are going through but I wanted to share my own experience since I was also a partner when I had to pull back." Defendant Moy shared her personal experience of becoming a working mother for the second time and working part-time until her children grew up. Defendant Moy suggested that Plaintiff work part-time until her son recovers, implying that she could not balance both responsibilities.

139.    Plaintiff responded to Defendant Moy that she has always worked full time, even when her children were younger, and it was impossible at her level to limit work hours, especially given that women in public accounting who agree to work a part-time schedule wind up working a full-time schedule but with a part-time salary. Defendant Moy offered no solutions and ultimately ignored Plaintiff's complaints.

140.    On October 27, 2022, Plaintiff was compelled to send a detailed email to Defendant Moy expressing her profound concern about the manner in which BDO handled her leave situation and the unexpected financial hardship imposed upon her-without notice- during her family's medical crisis.

141.    In this correspondence, Plaintiff explicitly stated that her "sense of trust with how my personal matter has been handled has wavered" and revealed that her monthly draw had been

31

slashed to "approximately half of what I would have expected," leaving her financially vulnerable while caring for her severely disabled son.

142.     Plaintiff's email further exposed BDO's duplicitous conduct, noting that despite extensive discussions about her return-to-work plans, "there was never a discussion about how my schedule will affect my draw" and that the arbitrary reduction came as a complete surprise.

143.     This communication demonstrates that Plaintiff was actively seeking clarity and fairness from BDO's leadership, only to be met with financial punishment and administrative runarounds that further evidenced the company's retaliatory intent.



144.     Traumatized by her experience with Northeast leadership, on October 28, 2022, Plaintiff spoke to Karen Stone, Southeast Market Managing Partner, to resume prior discussions regarding Plaintiff's plan to relocate to Florida, which had been previously approved before Chris's stroke.

145.     Plaintiff felt this move was necessary both due to the significant emotional distress from her mistreatment by Defendants DeMong and Winter and also the significant burden of financially supporting her family.

146.     However, Plaintiff feared that if she relocated to Florida, Defendant DeMong would reduce her compensation further and she discussed her concerns with Ms. Stone.

147.     During the call, Plaintiff explained that BDO prorated her salary as a result of Plaintiff taking leave and needing to ramp back up to full time. Ms. Stone expressed her surprise and confusion since she understood, as did Plaintiff, that Plaintiff's earnings were based on revenue instead of hours worked. Ms. Stone encouraged Plaintiff to advocate for being restored to a full-time salary because nothing changed with respect to Plaintiff's revenue base and business development efforts.

148.     However, given the recent aggression she experienced upon her return from FMLA leave, Plaintiff shared with Ms. Stone that she was very concerned that her compensation would be further reduced if she moved to Florida.

149.     Ms. Stone indicated that she would speak to Defendant DeMong.

150.     That same day, Ms. Stone texted Plaintiff informing her that Defendant DeMong supported her relocation to Florida to lead the Boca Raton office, saying her "strengths are what we need [in southeast Florida]."



151.    However, just days later on October 31, 2022, Ms. Stone's tone with Plaintiff was eerily different than their conversation on October 28, 2022.

152.    Ms. Stone made a complete 180 degree change, saying that she was "very proud of the firm for doing all that they did to support [Plaintiff]."

153.    During this conversation, Ms. Stone communicated that Defendant DeMong would maintain Plaintiff's salary base in Florida. In reliance on Ms. Stone and Defendant DeMong's statements, Plaintiff and her family prepared to move to Florida.

154.    On November 7, 2022, after BDO failed to address her complaints of discrimination, Plaintiff again reached out to Defendant Cordon via email to inquire about her return to work/leave of absence options and related compensation/benefits impact, including how long she qualified for 100% leave and how her reduced draw was computed.

155.    Unsurprisingly, Defendant Cordon failed to provide information regarding how Plaintiff's monthly draw was calculated and told Plaintiff to discuss it with Defendant DeMong (who previously told her to discuss it with Defendant Cordon).

156.    Additionally, Defendant Cordon indicated that Plaintiff was only entitled to a 100%
draw for the five months of Plaintiff's leave of absence (May 9, 2022 – September 19, 2022). While
Plaintiff quickly responded that May 9, 2022 – September 19, 2022, was closer to four months,
Defendant Cordon never responded.



### G. BDO Continues to Ignore Plaintiff's Complaints and Subjects Her to Increasing Discrimination and Retaliation

157.    In November 2022, Plaintiff attempted to participate in an out-of-state tri-annual
training conference to renew one of her internal BDO certifications.

158.    Because she could not attend in person, Plaintiff asked several National Tax
Partners if she could attend the conference virtually. Nobody accommodated Plaintiff's request nor
entertained any potential solutions.

159.    Instead, Plaintiff was bounced back and forth to several partners and humiliated on
group emails initiated by Defendant Winter who unnecessarily copied other partners on the email
chain demanding Plaintiff indicate her intentions to cover the material.

160.    Plaintiff called Michael Williams and Dan Newton, both partners in the Boston
office under direct supervision and authority of Defendant DeMong, who said it would be too much

work to create a virtual replica of the program because it required coordination with the BDO group that accredits online learning.

161.     Plaintiff then called the accreditation group and obtained the requirements, which were manageable, and Plaintiff offered to prepare all the necessary documents and questions required, but Mr. Williams and Mr. Newton both refused, claiming they did not have the time to assist.  Mr. Williams referred Plaintiff to National ASC740 leader Steve Maniaci who suggested that Plaintiff re-take the same course she took 3 years prior and then travel later in the year to the next in-person session.

162.     Ultimately, sensing an internal strategy to isolate and retaliate against Plaintiff for voicing her concerns, Plaintiff reached out to an esteemed colleague, Michael Cesarino, who provided a solution whereby Plaintiff would not need to immediately renew this BDO certification.  Instead, Plaintiff could be the lead reviewer performing all the substantive work and Mr. Cesarino or another partner would then be a second level reviewer to her work and ultimate signer.  None of Plaintiff's clients were assurance clients and thus the requirement and arbitrary demand, without regard to her FMLA leave, to complete this re-certification training was purely administrative. This training was intended for partners who sign off on audits and Plaintiff was hired as an outsourced tax provision solution for clients, a prohibited role for BDO publicly traded audit clients.

163.     At the end of November 2022, despite having indicated that she returned to full capacity at the beginning of November, Plaintiff's draw had still not been fully restored. Instead, Defendant DeMong delayed restoring Plaintiff's draw by questioning if she in fact had returned to full-time status and telling Plaintiff that she needed to get clearance from Defendant Winter.

164.     At this point, Plaintiff had repeatedly told the relevant colleagues that she was "back to normal operations" and was reinstated on her most prominent clients. However, BDO unlawfully continued to pay Plaintiff a reduced monthly draw until January 2023.

165.     On top of everything else, BDO also failed to provide Plaintiff with the appropriate support staff for one of her clients, a partnership structure with which Plaintiff had created a relationship for over four years with BDO, but whose relationship with Plaintiff spanned for close to twenty years.

166.     As a result, Plaintiff was left with no Senior Manager for this client. At the end of November 2022, Plaintiff asked Maureen McGetrick, a Tax Partner who took over the client while Plaintiff was on leave, if she could continue to assist with the client with the understanding that Plaintiff would retain contract authority and thus revenue credit. Ms. McGetrick agreed to stay on with the client in support of Plaintiff's circumstances, acknowledging that there was an impending transaction that would likely cease the BDO relationship.

167.     Plaintiff also spoke to Ms. McGetrick about Plaintiff's situation at BDO (particularly about Plaintiff's units being reduced). Ms. McGetrick called the mistreatment of Plaintiff "disgusting" and stated that she was "not surprised."

168.     On December 13, 2022, Defendant DeMong emailed every partner, informing them of their target core tax revenue goal for FY2024 (May 1, 2023 – April 30, 2024). While no other partner's core tax revenue goal was set above $700,000, Plaintiff's goal was set at $1.25 million. As a result, it was clear that BDO was attempting to set Plaintiff up for failure.



169.    On December 31, 2022, Plaintiff emailed Defendant Winter to arrange a call to discuss how she could get client assignments to reach her [unrealistic] goal. Plaintiff requested that she receive credit for the revenue that was transferred to the Boston office partner, similar to the credit that was promised her for the client revenue that was being transferred to Maureen McGentrick. Both of these proposals were denied with no explanation as to the variance in treatment.

170.    The meeting between Plaintiff and Defendant Winter was scheduled for early January 2023. During this meeting, Plaintiff highlighted again that her core tax revenue goal was double everyone else's. In response, Defendant Winter stated, "Well, we're not giving you a pass just because you were on leave. You're going to have to make it up all in one year."

171.    It was shocking to Plaintiff that Defendant Winter directly connected Plaintiff's annual benchmarks to her protected leave.

172.    On January 10, 2023, Ms. McGetrick informed Plaintiff that one of Plaintiff's longtime clients and accounts that Plaintiff had won for the Company (both audit and tax work) would be transferred to Ms. McGetrick per the direction of Defendant Winter and Mr. Bayer.

173.    This was done despite the fact that in November 2022, while Plaintiff was on leave, Plaintiff and Ms. McGetrick agreed that Ms. McGetrick would take over the account to aid with some technical considerations, with the understanding that Ms. McGetrick would not receive revenue credit.

38

174.     Plaintiff asked Ms. McGetrick if she told Defendant Winter and Mr. Bayer about the agreement they had made concerning the management of the accounts. Ms. McGetrick said she did, but Mr. Bayer and Defendant Winter "insisted" that Ms. McGetrick should completely take the account.

175.     Ms. McGentrick is a seasoned tax partner with significant revenue and the revenue from this account was insignificant to her total revenue; unlike Plaintiff whose circumstance was very different, especially since BDO had lost one of her biggest clients when she was out on leave.

176.     Furthermore, providing Ms. McGetrick credit for an account Plaintiff brought in directly contradicted prior firm practice.

177.     As such, Plaintiff called Mr. Bayer and asked directly whether this was true and he confirmed that he and Defendant Winter insisted that Ms. McGetrick take this account regardless of any agreement she and Plaintiff had.

178.     During this phone call, Plaintiff made it very clear to Mr. Bayer that she felt discriminated against, indicating that she firmly believed that the loss of this client and all the other changes to her employment terms were being done solely because she took leave to care for her disabled son and the fact that she had been required to take on a caregiver role for him.

179.     Plaintiff exclaimed, "How could they do this to me? This is inhumane. You have daughters. You have always been such a strong supporter. How can you do this to me?" Instead of consoling the visibly upset Plaintiff, Mr. Bayer responded, "Look kid, I'm semi-retired. I took this role on with the knowledge it would be short term and as a favor to DeMong. I have one foot out the door. You need to discuss your concerns with Winter and DeMong they are the ones calling the shots now. Eleni, I am not comfortable having this conversation by myself."

180.     Immediately after her call with Mr. Bayer, Plaintiff texted Defendant Winter and asked if it was true that Ms. McGetrick had replaced her as the contracting authority on one of Plaintiff's client.

181.     Defendant Winter confirmed that Ms. McGetrick had taken over the role. In response, Plaintiff reminded him that she and Ms. McGetrick had agreed that Plaintiff would remain the contracting authority due to her long-standing rapport with the client.

182.     Moreover, Plaintiff informed Defendant Winter that she always had someone working on the matter with her to assist with technical aspects of the partnership in the past and was never previously denied revenue credit throughout her 4-year relationship with the client.

183.     Plaintiff then informed Defendant Winter that she had "to go to HR on this." Plaintiff stated, "I went on leave, and that's the only reason there is a change."



184.     On that same day, Plaintiff feeling she had exhausted all other channels that should have been available to her, scheduled a meeting with Mr. Becker to discuss the discrimination and

retaliation she had faced at BDO, hoping that the discriminatory treatment by Defendant DeMong would be resolved if Defendant Becker learned of the extent of the campaign.

185.    However, Defendant DeMong unexpectedly joined this call and interfered with Plaintiff's protected activity, by intimidating her and preventing her from complaining regarding his treatment towards her. Throughout the conversation, Defendant DeMong interjected and prevented Mr. Becker from addressing Plaintiff's concerns.

186.    Tellingly, the few times Mr. Becker did speak, he made his endorsement of the discriminatory conduct clear, including by stating, "I can't even begin to imagine what you're going through, but this is a business." Coldly, Mr. Becker told Plaintiff, "You should be grateful that we're not holding you to any milestones for the current year." When Plaintiff reminded Mr. Becker that he had always praised her work, she asked if he still felt the same way and he responded "I'm proud of all of my partners."

187.    On January 11, 2023, Plaintiff realized she had been excluded from the annual JP Morgan Healthcare Conference held in San Francisco despite the fact that BDO's Leadership Team had previously invited Plaintiff to this conference.

188.    When Plaintiff confronted two colleagues about being excluded, both responded vaguely. Kate Lottridge, a Life Sciences Marketing Senior Manager, replied, "The number of BDO attendees this year was quite small – nothing like the previous years."

189.    When Plaintiff asked Ms. Karalis who was responsible for determining the attendees, Ms. Karalis nonsensically responded, "No one is ever in charge of inviting potential candidates to attend were put forth to leadership [Mr. Frangiskatos and Defendant DeMong] who approved attendees."

190.    Ms. Lotteridge confirmed that the decision regarding who would attend this January

2023 conference was made in October/November 2022 after Plaintiff has returned from leave.



191.    In January 2023, Defendants also failed to invite Plaintiff to attend BIONJ, a

significant life sciences event, requiring her to request permission from Defendant Winter to ensure

reimbursement. Many other BDO partners attended and yet Plaintiff had been excluded.

192.    In January 2023, while Plaintiff was already enduring the devastating aftermath of

her son's catastrophic brain injury and BDO's relentless campaign of retaliation, Plaintiff received yet

another crushing blow when her father was diagnosed with cancer.

193.    This additional family medical emergency created an unthinkable burden for

Plaintiff, who was simultaneously caring for her severely disabled son, managing her own

deteriorating employment situation, and now facing the prospect of losing her father to a life-

threatening illness.

194.    Having witnessed firsthand how BDO had systematically destroyed her career in response to her son's medical emergency, Plaintiff reasonably feared that revealing another family medical crisis would invite further retaliation and potentially accelerate BDO's efforts to terminate her employment.

195.    As such, even though her father only needed surgery to remove the cancer, Plaintiff felt compelled to hide her father's serious medical condition from her employer, which speaks volumes about the hostile and discriminatory environment that BDO had created.

196.    Rather than fostering a workplace culture of support and understanding for employees facing family medical emergencies, BDO had demonstrated through its treatment of Plaintiff that such circumstances would be met with punishment, isolation, and career destruction.

197.    This chilling effect on Plaintiff's ability to seek accommodation or support for legitimate family medical needs further evidences BDO's pattern of discrimination against employees in caregiver roles.

**H.  . BDO Unlawfully Terminates Plaintiff**

198.    In January 2023, Plaintiff continued to fight for her future at BDO, including a discussion with Danny Castro, the Lead Tax Partner for the Southeast Florida region, to discuss Plaintiff's transfer to Florida.

199.    Following their January 10, 2023 meeting, Plaintiff did not have any discussions with Defendant DeMong or Defendant Winter. Moreover, no one ever communicated dissatisfaction with Plaintiff's work performance. In fact, during this time, Defendant DeMong approved a waiver of a background check for a new client of Plaintiff's.

200.    Plaintiff had made multiple attempts to speak with Mr. Frangiskatos to develop market opportunities together and was also connecting with other partners across multiple offices to

develop market strategies together for new opportunities (Lisa Embon, for example and Business Developers in Mid-Atlantic region).

201.    Plaintiff also informed Defendant DeMong that she had a request for an assurance proposal in the Florida region, to which he did not even reply.

202.    In light of Plaintiff's imminent transfer to Florida, Mr. Frangiskatos suggested Plaintiff work with a partner in Atlanta who was transferring to the Florida market. They discussed the client opportunity at length as well as BDO strategy and even relocation matters including reimbursement offered by the firm and real estate markets each were considering.

203.    And yet, on March 22, 2023, Defendant DeMong requested a meeting with Plaintiff for the following day without specifying the topic. Naturally, Plaintiff asked what the nature of the meeting would be, so she could prepare accordingly.

204.    Defendant DeMong responded, "Nothing specific. Thanks."

205.    The calendar invite was simply labeled "Catch up."



206.    The following day, on March 23, 2023, Plaintiff met with Defendant DeMong and to her surprise, Bernadette Pieters, BDO's Chief Diversity, Equity, and Inclusion Officer also attended this meeting.

44

207.    Defendant DeMong started the meeting by claiming that Plaintiff had significant performance issues for fiscal year 2022. Defendant DeMong then claimed he had seen similar performance issues over the past few months with no real improvement, so he was asking her to withdraw from the partnership.

208.    Defendant DeMong then proceeded to threaten Plaintiff by telling her that if she didn't withdraw, he would ask the Board to terminate her, and claimed they already had the Board's support to do so.

209.    Plaintiff was completely shocked and asked what performance issues Defendant DeMong was referring to. Defendant DeMong unsurprisingly did not have an answer and merely proclaimed that the call with Mr. Becker on January 10, 2023, was the *final straw*.

210.    Notably, this January 10, 2023 meeting, which Defendant DeMong was now admitting led to Plaintiff's termination, was the meeting in which *Plaintiff engaged in protected activity by reporting discrimination and retaliation that Plaintiff faced at BDO.*

211.    Plaintiff pointed out that there were no performance issues discussed during that call but Defendant DeMong ignored this point.

212.    Plaintiff explained again that this is discrimination by explaining that she felt she was being punished for her son's health issues. Ms. Pieters, BDO's Chief Diversity, Equity, and Inclusion Officer, intervened, claiming this was not true. Ms. Pieters insisted that the firm had supported Plaintiff but her termination was based on expectations of Plaintiff's performance.

213.    Plaintiff responded that in FY2022, she had the best year revenue-wise. Moreover, Plaintiff pointed out that it had only been a few months since she had returned from leave, which is not enough to evaluate her performance.

45

214.    Ms. Pieters was unable to indicate how BDO had allegedly supported her or what performance issues resulted in her termination. Instead, Ms. Pieters informed Plaintiff that Ms. Pieters would send Plaintiff the withdrawal agreement shortly after their call which she did.

215.    Ms. Pieters told Plaintiff that if she signed the withdrawal agreement, Plaintiff would be eligible for two more monthly draws – amounting to approximately $40,000.

216.    However, Ms. Pieters told Plaintiff that if Plaintiff refused to sign the withdrawal agreement, Plaintiff would be terminated.

217.    Feeling defeated and unheard, Plaintiff said she would review the withdrawal agreement. Plaintiff also requested her performance rating, which BDO failed to provide prior to terminating Plaintiff.

218.    Plaintiff refused to sign the withdrawal agreement as she realized it was BDO's attempt to disguise their unlawful termination of Plaintiff as a resignation.

219.    Unlike a male Tax Partner, Spiro Leunes, who was terminated in October 2020, Plaintiff was not offered any assistance to get a new job.

220.    Despite having been a successful partner with materialized client revenue and multiple revenue streams for other partners, as well as consistent promotions and added responsibilities, Ms. Lagos was offered the same $40,000 severance package offered to Mr. Leunes, whom Defendant DeMong frequently undermined and complained to Ms. Lagos about regarding his failed revenue generation.

221.    Plaintiff then reached out to Ms. Stone, a key figure handling Plaintiff's transfer to lead the Boca Raton office, a prominent role in a booming market, and even she was unaware of Plaintiff's termination.

222.     Similarly, when Plaintiff contacted Mr. Frangiskatos, who she was practically begging for a meeting with him for months, and informed him of her termination, he also indicated surprise, saying "oh no, I'm so sorry, I'll call you later" which he never did.

223.     On April 7, 2023, BDO terminated Ms. Lagos "for cause" despite lacking any valid basis for doing so.

224.     As set forth above, BDO breached their Partnership Agreement with Plaintiff by terminating her without sufficient cause in clear violation of the contract's provisions.

225.     Plaintiff performed her duties under the Partnership Agreement by maintaining and developing client relationships, bringing in new business, and doing everything in her power to meet or exceed her realistic goals. In return, BDO reduced her units due to their own failure to nurture her accounts when she was on FMLA leave, removed her titles, and ultimately terminated her without cause.

226.     Sadly, this is not the only time BDO female partners were separated from the company under suspicious circumstances at and around the time of Plaintiff's termination.[7] Despite being well-respected and loyal BDO employees, two female partners separated from the company— Stephanie Giammarco (who had been at BDO for 23 years) and Kristin Winford (who had been at BDO for seven years).

227.     The timing of Plaintiff's termination is particularly suspect when viewed in light of BDO's Employee Stock Ownership Plan (ESOP) transaction, which resulted in significant litigation.[8]

---

[7] Jason Bramwell, *Some High Level Folks Have Abruptly Left BDO and No One Seems to Know Why (UPDATE)*, GOING CONCERN (Oct. 28, 2022), https://www.goingconcern.com/high-level-leaders-leaving-bdo/.

[8] Adrienne Gonzalez, *Lawsuit Counterclaim By an Ex-Partner Accuses BDO of Shady Behavior Around the ESOP, PE Deal, and Corporation Conversion*, GOING CONCERN (May 1, 2024), https://www.goingconcern.com/lawsuit-counterclaim-by-an-ex-partner-accuses-bdo-of-shady-behavior-around-the-esop-pe-deal-and-corporation-conversion/.

228.    In March 2023—the same month Plaintiff was terminated—BDO was preparing for a major corporate restructuring that would convert the firm from a partnership to a corporation and establish an ESOP. *Id*. By August 2023, BDO had arranged $1.3 billion in debt financing from Apollo Global Management to fund this transition. *Id*.

229.    According to a class action lawsuit filed in January 2025, the ESOP purchased 42% of BDO's common stock from executives and other principals for approximately $1.3 billion. *Id*. Multiple former partners have filed counterclaims against BDO alleging serious misconduct related to this transaction, including claims that "BDO leadership made false and misleading statements to get the ESOP vote to pass," "misled the partnership that there was no private equity transaction," and "delayed partner retirements and reactivated retired partners to garner sufficient votes." *Id*.

230.    Another class action lawsuit filed on behalf of ESOP participants alleges that "BDO's board of directors ensured that control of BDO was kept in the hands of management rather than the ESOP, used inflated revenues to value BDO, and engaged in a self-dealing transaction."

231.    The recent class action lawsuit filed by current BDO employee Tristin Taylor on January 17, 2025, in the U.S. District Court for the District of Massachusetts provides additional evidence of potential corporate malfeasance. According to the complaint, BDO executives faced a substantial conflict of interest in this transaction, as their personal financial interests were directly tied to obtaining an inflated valuation for the company's stock.[9]

232.    Most troublingly, the complaint alleges that "BDO had come under scrutiny by the Public Company Accounting Oversight Board for violations of PCAOB rules and audit standards" and that "for years leading up to the transaction, the PCAOB had found a higher level of significant deficiencies in BDO's audit work than any other audit firm reviewed by PCAOB." *Id.* Instead of

---

[9] BDO USA ESOP Litig., No. 1:25-cv-10128 (D. Mass. filed Jan. 17, 2025), https://www.cohenmilstein.com/case-study/bdo-usa-esop-litigation/.

finding an arm's-length purchaser who would scrutinize these issues, BDO executives allegedly "created a captive buyer for their shares through the creation of the ESOP." *Id.* The complaint further alleges that despite selling 42% of the company's stock to the ESOP for $1.3 billion, the executives retained effective control over both the company and the ESOP itself. *Id.*

233.    Notably, had Plaintiff not been wrongfully terminated just months before this transaction, she would have been entitled to millions of dollars in compensation as a full equity partner. The timing of her termination strongly suggests that BDO sought to eliminate her partnership stake before the lucrative ESOP transaction to avoid paying her fair share. It is also suspect that the egregious action of reducing her units by 100 while on leave and then slashing her draw practically in half without notice were all connected to the effort to increase the unit value of the partnership before the ESOP transaction.

234.    Following her termination, Plaintiff engaged in extraordinary efforts to mitigate her damages through an aggressive job search. Plaintiff submitted over 100 employment applications to accounting firms across the country, with only approximately 10% resulting in interviews despite her extensive qualifications and proven track record of success.

235.    Between April 2023 and January 2025, Plaintiff progressed to final-round interviews with at least four major accounting and professional services firms. In each case, Plaintiff received positive feedback throughout the interview process, only to have communications suddenly and inexplicably cease at the final stage.

236.    In several instances, Plaintiff was told that all that remained were "administrative checklist items" such as meeting with the CEO before communication abruptly ended. Even Plaintiff's former client that was transferred to BDO's Boston office engaged in employment discussions with her that ceased after the client said they will speak to the BDO team about the hire.

237.    Just a few months prior to Plaintiff's leave, this client had sent a glowing text to Plaintiff saying "I can't thank you and Anne enough for your help these past few weeks."

238.    Through industry contacts, Plaintiff learned that her employment prospects were being undermined by BDO. In one case, Plaintiff learned that a senior executive at a prospective employer had previously worked with Defendant Winter and had other close connections with BDO leadership. This strongly suggests that Defendants are interfering with Plaintiff's employment prospects in further retaliation for Plaintiff's good faith efforts to adjudicate her claims.

239.    Plaintiff's specialized expertise in ASC740 tax outsourcing and co-sourcing made her particularly valuable in her field but also created challenges in seeking alternative employment. Professional recruiters advised Plaintiff that many firms were reluctant to consider her for positions below partner level, viewing her as a "flight risk" due to her previous compensation and partnership status at BDO. Simultaneously, firms appeared hesitant to hire her at the partner level after her termination from BDO without a book of business.

240.    On January 3, 2025, Plaintiff's son suffered a second stroke that resulted in significant setbacks from his previous recovery, including right side hemiplegia, ataxia, diplopia, dystonia, nystagmus, tinnitus, hearing loss and speech impairment. Throughout this ordeal, he has gone from being an active athlete to becoming wheelchair-bound and unable to perform basic self-care activities to living independently at a dorm and now back to home care.

241.    During this period of already significant emotional upheaval and unbearable stress, Plaintiff was further harmed by BDO's unlawful conduct. Following her wrongful termination, BDO's campaign of retaliation against Plaintiff extended to denying her family access to essential healthcare coverage through a deliberate and calculated interference with her COBRA rights.

242.    Despite Plaintiff's diligent efforts to maintain her health insurance coverage—including making multiple payments and providing extensive documentation to support her appeal—BDO's COBRA administrator, Flores & Associates, systematically denied her appeals and terminated her family's healthcare coverage during a period when her severely disabled son required ongoing medical treatment.

243.    The correspondence between September and October 2024 reveals a pattern of administrative obstruction, with Flores repeatedly citing technical payment deadlines while dismissing the extenuating circumstances surrounding Plaintiff's family medical crisis.



244.     This denial of COBRA coverage was particularly devastating given that Plaintiff's son had suffered a second catastrophic stroke in January 2025, requiring immediate and expensive medical intervention that the family could no longer afford without insurance.

245.     BDO's interference with Plaintiff's COBRA rights represents yet another deliberate act of retaliation designed to inflict maximum financial and emotional harm on Plaintiff and her disabled child.

246.     Notably, on May 29, 2025, it was announced that BDO's Board of Directors has identified Mr. Becker, as the candidate to succeed CEO Wayne Berson, who plans to retire effective June 30, 2026. [10] The succession is subject to ratification by BDO's principals through a vote expected in July, with the new CEO's term expected to commence July 1, 2026.[11] This announcement further highlights the discriminatory and sexist atmosphere that BDO not only condones but rewards.

## FIRST CAUSE OF ACTION
### UNLAWFUL RETALIATION IN VIOLATION OF THE FMLA
*Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

247.     Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully set forth herein at length.

248.     Section 2612(a)(1)(A) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period…Because of the birth of a son or daughter of the employee and in order to care for such son or daughter."

249.     Further, Section 2615(a) of the Family Medical Leave Act, states in pertinent part:
         Interference with rights.

---

[10] BDO USA Announces CEO Succession Plan, BDO (May 29, 2025), https://www.bdo.com/insights/press-releases/bdo-usa-announces-ceo-succession-plan.
[11] *Id.*

(1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

250.    By the actions described above, among others, Defendants have retaliated and discriminated against Plaintiff for exercising her FMLA rights by altering the terms and conditions of and terminating Plaintiff's employment.

251.    As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and will continue to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, and other relief.

252.    As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

253.    Defendants knew and/or showed reckless disregard that their conduct was a violation of Plaintiff's FMLA rights.

## SECOND CAUSE OF ACTION
### UNLAWFUL INTERFERENCE IN VIOLATION OF THE FMLA
### *Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

254.    Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully set forth herein at length.

255.     Section 2612(a)(1)(A) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period…Because of the birth of a son or daughter of the employee and in order to care for such son or daughter."

256.     Further, Section 2615(a) of the Family Medical Leave Act, states in pertinent part: Interference with rights.

> (3) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

> (4) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

257.     By the actions described above, among others, Defendants have interfered with and discriminated against Plaintiff for exercising her FMLA rights by altering the terms and conditions of and terminating Plaintiff's employment.

258.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and will continue to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, and other relief.

259.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

260.     Defendants knew and/or showed reckless disregard that their conduct was a violation of Plaintiff's FMLA rights.

## THIRD CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF GENDER/SEX
## IN VIOLATION OF THE NYSHRL
### *Against Defendants BDO USA PC, Matthew Becker, Mathew*
### *Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

261.      Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if said paragraphs were fully set forth herein at length.

262.      New York State Executive Law § 296 states in pertinent part:

> 1(a). It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identify or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

263.      By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her gender/sex.

264.      As a result of the facts and conduct complained of herein, Plaintiff has suffered and continues to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

265.      Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## FOURTH CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF FAMILIAL STATUS
## IN VIOLATION OF THE NYSHRL
### *Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

266.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if said paragraphs were fully set forth herein at length.

267.    New York State Executive Law § 296 states in pertinent part:

> 1(a). It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identify or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

268.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her familial status.

269.    As a result of the facts and conduct complained of herein, Plaintiff has suffered and continues to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

270.    Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## FIFTH CAUSE OF ACTION
## DISCRIMINATION BASED ON ASSOCIATION WITH PLAINTIFF'S DISABLED SON IN VIOLATION OF THE NYSHRL
### *Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

271.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if said paragraphs were fully set forth herein at length.

272.    New York State Executive Law § 296 states in pertinent part:

> 1(a). It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identify or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

273.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her association with her disabled son.

274.    As a result of the facts and conduct complained of herein, Plaintiff has suffered and continues to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

275.    Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## SIXTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF THE NYSHRL
### *Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

276.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if said paragraphs were fully set forth herein at length.

277.    New York State Executive Law § 296 states in pertinent part:

> 7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

278.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff for engaging in protected activities pursuant to the NYSHRL, including by altering the terms and conditions of Plaintiff's employment, subjecting her to a hostile work environment, and ultimately terminating Plaintiff's employment in retaliation for her protected complaints.

279.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain, and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

280.    Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**SEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING DISCRIMINATION**
**IN VIOLATION OF THE NYSHRL**
***Against Individual Defendants***

281.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if said paragraphs were fully set forth herein at length.

282.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

283.    Individual Defendants engaged in unlawful discriminatory practices in violation of the NYSHRL by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against Plaintiff detailed herein.

284.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

285.    Accordingly, as a result of Individual Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**EIGHTH CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF GENDER/SEX**
**IN VIOLATION OF THE NYCHRL**
***Against Defendants BDO USA PC, Matthew Becker, Mathew***
***Demong, Steven Winter, Lucy Cordon, and Catherine Moy***

286.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

287.    New York City Administrative Code §8-107(1) provides that it shall be unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decision, sexual orientation, uniform service, height, weight, or immigration or citizenship status of any person…to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment."

288.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her gender/sex.

289.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

290.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law.

## NINTH CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF CAREGIVER STATUS
## IN VIOLATION OF THE NYCHRL
### *Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

291.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

292.    New York City Administrative Code §8-107(1) provides that it shall be unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decision, sexual orientation, uniform service, height, weight, or immigration or citizenship status of any person…to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment."

293.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her caregiver status.

294.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

295.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law.

## TENTH CAUSE OF ACTION
### DISCRIMINATION BASED ON ASSOCIATION WITH PLAINTIFF'S DISABLED SON IN VIOLATION OF THE NYCHRL
*Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

296.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

297.    New York City Administrative Code §8-107(1) provides that it shall be unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decision, sexual orientation, uniform service, height, weight, or immigration or citizenship status of any person…to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment."

298.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, subjecting her to a hostile work environment, and discriminating against her based on her association with her disabled son.

299.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety,

pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

300.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law.

## ELEVENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF NYCHRL
*Against Defendants BDO USA PC, Matthew Becker, Mathew Demong, Steven Winter, Lucy Cordon, and Catherine Moy*

301.    Plaintiff hereby repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

302.    New York City Administrative Code §8-107(7) provides that "it shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or ([v]vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter."

303.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff for engaging in protected activities pursuant to the NYCHRL, including by altering the

terms and conditions of Plaintiff's employment, subjecting her to a hostile work environment, and terminating Plaintiff's employment in retaliation for her protected complaints.

304.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

305.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law.

<strong>TWELFTH CAUSE OF ACTION<br>AIDING AND ABETTING DISCRIMINATION<br>IN VIOLATION OF THE NYCHRL<br><em>Against Individual Defendants</em></strong>

306.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

307.    New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any acts of the acts forbidden under this chapter, or attempt to do so."

308.    Individual Defendants engaged in an unlawful employment practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling, or coercing the unlawful discriminatory and retaliatory conduct against Plaintiff described herein.

309.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past

and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

310.    Accordingly, as a result of the unlawful conduct of Individual Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

### THIRTEENTH CAUSE OF ACTION
### BREACH OF CONTRACT
#### *Against Defendant BDO*

311.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

312.    The Partnership Agreement between Plaintiff and BDO constitutes a valid and binding contract that sets forth the rights and obligations of both parties. Pursuant to Section 11.1 of the Agreement, a Partner's interest in the Partnership "shall continue until it is terminated" according to the provisions outlined in the Agreement, including that termination can only occur "for cause by vote of the Board of Directors" under Section 11.4, with "cause" specifically defined in Section 11.5.

313.    The Partnership Agreement between Plaintiff and BDO constitutes a valid and binding contract that sets forth the rights and obligations of both parties. Pursuant to Section 11.1 of the Agreement, a Partner's interest in the Partnership "shall continue until it is terminated" according to the provisions outlined in the Agreement, including that termination can only occur "for cause by vote of the Board of Directors" under Section 11.4, with "cause" specifically defined in Section 11.5.

314.    Defendant BDO willfully and wantonly breached the Partnership Agreement by terminating Plaintiff without legitimate "cause" as defined in Section 11.5. While BDO claimed "significant performance issues," this assertion is directly contradicted by Plaintiff's exceptional performance metrics. Furthermore, BDO's inability to specify any actual performance issues when pressed during the termination meeting demonstrates that no legitimate "cause" existed.

315.    Defendant BDO further breached Section 11.5(h) of the Partnership Agreement, which explicitly exempts "disability due to physical or mental illness" from constituting cause for termination. Plaintiff's need to take leave to care for her disabled son following his catastrophic brain stroke reasonably falls under this exemption, and BDO's actions in penalizing her for this protected leave constitute a clear breach of the Agreement.

316.    Defendant BDO breached Section 5.1 of the Partnership Agreement by unilaterally reducing Plaintiff's partnership units by 100 while she was on protected leave, effectively cutting her compensation by approximately $120,000 annually despite her exceptional performance in 2022. This reduction occurred without proper consultation or adherence to partnership governance procedures.

317.    Defendant BDO breached Section 5.2 of the Partnership Agreement by unilaterally reducing Plaintiff's monthly draw from $35,000 to approximately $20,000 without proper notice or justification, thereby creating significant financial hardship for Plaintiff while she was responsible for the care of her severely disabled son.

318.    Pursuant to Section 12.1 of the Partnership Agreement, upon termination, Plaintiff is entitled to receive her allocable share of profits for the termination year (Section 12.1(a)), the balance in her capital account (Section 12.1(b)), her share in net accounts receivable and work in

process (Section 12.1(c)), the balance in her undistributed earnings account (Section 12.1(d)), and any indebtedness of the Partnership to her (Section 12.1(e)).

319.    Defendant BDO has failed to properly compensate Plaintiff for her capital account of approximately $146,215, her tax-deferred compensation of approximately $104,209, and $225,000 in partnership contributions owed to her.

320.    Additionally, Plaintiff would have been entitled to millions from the ESOP transaction that occurred shortly after her wrongful termination, which appears to have been a key motivation for the timing of her dismissal.

321.    As a direct and proximate result of Defendant BDO's multiple breaches of the Partnership Agreement, Plaintiff has suffered substantial monetary and economic damages, including but not limited to, loss of past and future income and non-economic damages.

**FOURTEENTH CAUSE OF ACTION**
**INTERFERENCE WITH RIGHTS PROTECTED BY THE CONSOLIDATED**
**OMNIBUS BUDGET RECONCILIATION ACT**
***Against BDO USA, PC***

322.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

323.    Per the Public Health Service Act (hereinafter "PHSA") as amended by the Consolidated Budget Reconciliation Act (hereinafter "COBRA"), all public employers must provide discharged and/or terminated public employees with notice of their right to elect to continue participation in any employee health care benefit program that the discharged and/or terminated public employee had previously participated in during the course of his/her employment.

324.    A terminated employee is entitled to continue her health insurance for a specific period.

325.    As a terminated employee, Plaintiff was entitled to continue her health insurance, but Defendant interfered with that entitlement and denied her COBRA coverage.

326.    Plaintiff was wrongfully terminated for the reasons set forth above for "significant performance issues."

327.    Even assuming that Plaintiff was fired for "significant performance issues", which is vehemently denied and there is no basis for, that alleged wrongdoing does not rise to the level of "gross misconduct" sufficient under COBRA to allow an employer to deny continuation coverage to a terminated employee.

328.    Due to Defendant BDO's denial of continuation coverage, Plaintiff has suffered injuries.

329.    Plaintiff seeks all remedies and damages permitted under COBRA, including, but not limited to, reimbursement of all medical expenses, a daily penalty during period of non-coverage, costs, and attorney's fees.

**FIFTEENTH CAUSE OF ACTION**
**DEFAMATION PER SE**
***Against All Defendants***

330.    Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully set forth herein at length.

331.    By claiming that Plaintiff's employment was terminated under the false pretext of "significant performance issues," Defendants began a series of false statements of fact which have continued to date.

332.    By falsely accusing Plaintiff of underperforming in her job, beginning in March 2023 when Defendant DeMong and Bernadette Pieters claimed without any evidence that Plaintiff had "significant performance issues," Defendants' conduct has tended to injure Plaintiff in her trade, business, or profession by causing members of the public and in Plaintiff's professional environment to believe that Plaintiff was unfit to perform her profession.

333.    These false and defamatory statements about Plaintiff tend to expose Plaintiff to public contempt, aversion or disgrace, or induce an evil opinion of her in the minds of right-thinking persons and deprive her of friendly association in society. In the communities in which she works and performs, Plaintiff has been injured in her reputation and good standing and has been held up to ridicule and contempt.

334.    By reason of the foregoing, Plaintiff has suffered general and special damages in an amount to be determined at trial, damage to Plaintiff's reputation and standing in the community, shame, mortification, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in occupation, as well as emotional harm.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited under federal and state laws by retaliating against Plaintiff; discriminating against Plaintiff based on her gender/sex, familial and caregiver status, and association with her disabled son; and retaliating against Plaintiff for invoking her rights under the FMLA;

B.    Awarding damages to the Plaintiff for all lost wages and benefits resulting from Defendants' discrimination in employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff liquidated damages;

F.      Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action;

G.      Awarding monetary and/or economic damages, including but not limited to, loss of past and future income and non-economic damages for her breach of contract claim;

H.      Awarding all remedies and damages permitted under COBRA, including, but not limited to, reimbursement of all medical expenses, a daily penalty during period of non-coverage, costs, and attorney's fees;

I.      Awarding general and special damages in an amount to be determined at trial, damage to Plaintiff's reputation and standing in the community, shame, mortification, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in occupation, as well as emotional harm;

J.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  July 8, 2025
        New York, New York


                                    Respectfully submitted,

                                    **FILIPPATOS PLLC**

                                    By: _____
                                    Parisis G. Filippatos
                                    Erica T. Healey-Kagan
                                    Loris Baechi
                                    425 Madison Ave, Suite 1502
                                    New York, New York 10017
                                    T: 914.984.1111
                                    pfg@filippatoslaw.com
                                    ehealeykagan@filippatoslaw.com
                                    lbaechi@filippatoslaw.com
                                    *Counsel for Plaintiff*

                                    **MESIDOR PLLC**

                                    By: _____
                                    Marjorie Mesidor
                                    Kayla Strauss
                                    110 East 25th Street
                                    New York, New York 10010
                                    T: 212-930-6010
                                    mm@marjoriemesidor.com
                                    ks@marjoriemesidor.com
                                    *Counsel for Plaintiff*